[No. C. D. 2082. *En Banc.* August 10, 1936.]

*In the Matter of the Disbarment of* FRED M. BOND.[1]

*Matthew W. Hill,* for the board of governors.

*Guy E. Kelly* and *Meier & Meagher,* for accused.

MITCHELL, J.—This is a disbarment proceeding upon a complaint by Fred M. Sorenson against Fred M. Bond, of South Bend, Washington, before the board of governors of the Washington State Bar Association. Fred M. Sorenson at times may be spoken of as complainant, Fred M. Bond at times may be spoken of as respondent.

It appears that, in 1930, Fred M. Sorenson instituted an action in unlawful detainer against one Demir and recovered judgment in February, 1931. A premature enforcement of execution in that case constituted the basis for a suit by Demir against Fred M. Sorenson and the sheriff in conversion, which, upon

[1]Reported in 60 P. (2d) 54.

trial to a jury, resulted in a judgment in favor of Demir in the sum of $1,745, including costs.

After the judgment was entered, negotiations were had between Fred M. Sorenson and the Friendly Finance Company (hereinafter spoken of as the finance company), of South Bend, Washington, by which the finance company was to, and did, assume the burden of providing for Fred M. Sorenson a supersedeas or stay and cost bond on appeal, and also providing for the payment of costs and expenses of such appeal, as they occurred. The arrangement between the parties provided for several written instruments that were executed and delivered. One of the instruments was a quitclaim deed, intended as a mortgage, dated April 11, 1931, whereby, for an expressed consideration of $1,800, Sorenson conveyed certain real property in Pacific county to the finance company. The judgment in that case was affirmed. *Demir v. Sorenson,* 167 Wash. 363, 9 P. (2d) 383. The judgment was thereafter satisfied by the surety who gave the supersedeas bond.

After the affirmance of that judgment, Fred M. Sorenson began an action in the superior court against the finance company, Frank Nixon, Fred Eichner, C. L. Switzer (the three last named persons being officers of the finance company), and John I. O'Phelan, to have the quitclaim deed set aside and declared to be null and void. That action will be hereinafter referred to as cause No. 7892. The finance company appeared and, by cross-complaint, sought judgment that the deed was a mortgage, an adjudication of the amount due it on account of its disbursements in connection with the appeal in *Demir v. Sorenson,* all other amounts due it under the arrangements between the parties, and for a deficiency judgment. Upon the trial of that case, it appeared that the original instruments

between the parties, whether the quitclaim deed or other writings and whether original or copies, had all been lost or accidentally destroyed by the respective parties supposed to have possession of them. Even a certified copy of the deed which had been recorded had to be procured for the trial.

Several witnesses testified in cause No. 7892 with respect to the fact that several instruments had been executed and delivered between the parties, and also testified with reference to the contents of the instruments according to their recollections. Fred M. Bond testified upon that subject, saying, in effect, that, in a conference at the office of W. H. Abel at Montesano between some of the defendants and their attorneys, which took place after cause No. 7892 was commenced, he first learned of and saw a written promise of Fred M. Sorenson to reimburse the finance company, and testified with reference to signatures to the instruments.

In the trial of that case, contrary to the theory upon which Fred M. Sorenson's complaint was filed, he was denied any relief and it was held that the quitclaim deed was intended to be, and in fact was, a mortgage. The amount owing by Fred M. Sorenson was determined, and judgment of foreclosure and for a deficiency judgment in favor of the finance company was entered by Judge Homer Kirby on October 15, 1932. It was the testimony given by respondent in that trial on September 30, 1932, that constitutes the basis for the present complaint against him before the board of governors of the State Bar Association.

The judgment was set aside and a new trial ordered by Judge Homer Kirby on May 6, 1933, upon Fred M. Sorenson's motion, which set up, among other things, the fact that, since the trial, he had found a written

instrument involved in the controversy, which was as follows:

"KNOW ALL MEN BY THESE PRESENTS: That we Friendly Finance Company, a corporation of the state of Washington, Fred Eichner, John I. O'Phelan and Frank Nixon hereby warrant and guarantee to Fred Sorenson that we shall save and keep said Fred Sorenson harmless and without any loss for and by reason of the judgment secured by George Demir against said Fred Sorenson in the Superior court for Pacific county, Washington and also all attorney's fees, costs of court and expenses; and that if said Fred Sorenson suffers any loss by reason thereof we shall make good such loss to him.

"Dated this 23rd day of April, 1931.
                    "Friendly Finance Company
                    "By Frank Nixon, President
(Corporate Seal)      "C. L. Switzer, Secretary
                    "Fred Eichner
                    "John I. O'Phelan
                    "Frank Nixon"

This instrument is spoken of as a guaranty, and also as complainant's Exhibit "D."

The pleadings were then amended in cause No. 7892, and upon a trial before Judge Chester A. Batchelor, judgment was entered April 10, 1934, foreclosing the mortgage in the sum of $2,059.35, with interest, without providing for any deficiency judgment. The real property was sold at sheriff's sale on July 7, 1934, to the finance company for the amount of the judgment and costs.

Formal written complaint in the present proceedings was made by complainant on May 16, 1934, after the date of the final judgment in cause No. 7892. The substance of the complaint is that, in the trial before Judge Homer Kirby, the respondent testified that he had seen an agreement between complainant and the finance company containing obligations on the part of

each to the other; that the testimony was upon a material matter and was untrue, in that the memorandum was not signed by complainant; that it contained no obligation on complainant's part or statement of anything that he was to do, and that the agreement was, in effect, a guaranty by the finance company, Fred Eichner and John I. O'Phelan, saving complainant harmless by reason of the judgment secured against him in the Demir action in which complainant had taken an appeal to the supreme court.

The answer of the respondent in the present proceedings contains appropriate general denials and sets out his testimony, referred to in the complaint, as follows:

"I saw a copy of this agreement at Mr. Abel's office one forenoon when we had our first conference. It was before the answers were prepared or any of the pleadings, and when the conference closed a short time before noon, Mr. Abel was anxious to go to Aberdeen and we went over the several items pro and con and when we got down to this agreement I noticed the agreement was there and signed by the parties. I know Mr. Eichner's signature and Mr. Switzer's as a matter of fact. The agreement was signed. I know Mr. Sorenson's signature; it was there. I did not stop to read the agreement because we were in a hurry. I asked Mr. Eichner to prepare me a copy and forward it to me. Afterwards he came in and said he was sorry, he looked for it, but he did not know what in the world he had done with his copy. I asked him was it in duplicate; he said it was, I told him not to worry about it because Sorenson would have to produce his. I did not read the agreement all the way thru for the reason I mentioned; Abel was anxious to get away; and I did not read the contents. Q. Did you in anywise become cognizant of the contents? A. I knew the contract was dated in April, 1931, and I know it had certain propositions in it as a guaranty, but I did not read it through carefully; I glanced at it, but I know it had obligations on both sides, what Sorenson

was to do and what the company was to do. Q. Did you say the instrument was signed that you saw? A. It was signed by all the parties, it had the seal of the corporation on it. By Mr. Atwell: Q. Do you know whether it had reference to this deal or some other deal? A. I know it had reference to this deal. Q. How do you know? A. I examined the document enough to know that.''

The present cause was referred by the board of governors to a trial committee consisting of one member of the board of governors and two other persons who were not members of the board. This committee received and heard all of the testimony in the case as we have it here, except that of Frank Nixon, a witness for the respondent, who later testified before the other six members of the board. The findings of the trial committee were against the respondent. The conclusion of two members of that committee, other than the one who was a member of the board of governors, was that the respondent should be suspended for two years. The member of the board who acted on the committee refused to agree to suspension and recommended that the board of governors should have respondent appear before them and be reprimanded.

The matter was then heard before the other six members of the board upon the report of the trial committee and the evidence taken before it, together with the additional testimony of Frank Nixon. The findings were against the respondent and, together with the board's recommendation, constitute one instrument or report authenticated only by the signature of the president of the board and the attesting signature of the secretary of the board. A diversity of opinion was expressed without stating the views of any member of the board. The recommendation was as follows:

''Three of the four members of the board of governors making the foregoing findings, recommend to

the supreme court of the state of Washington that the said Fred M. Bond be suspended from the practice of law for the period of one year. The fourth member joining in said findings, recommends that said Fred M. Bond be permanently disbarred. Two members of the board participating herein dissent from the foregoing findings, and recommend that the charges be dismissed.''

Proper exceptions and objections were filed by the respondent.

The record in the case is voluminous and the evidence conflicting. The conflict arises upon the difference between the testimony of the complainant and that of all other witnesses in the case.

Whether necessary or not—since upon the whole record it appears that the conclusions drawn by the complainant are unwarranted—it may be well, before discussing the evidence, to refer to some facts and circumstances in the case, including prior relations of the principal parties, that will help in deciding the case.

(1) In the course of the trial before the trial committee, upon it already appearing that complainant had been involved in the Demir suit and cause No. 7892, he testified that he ''never had a lawsuit and lost out;'' and further, ''I never was in a lawsuit and never was before any court.'' But, in cross-examination, he admitted he had paid a judgment for the conversion of a woman's property, in which suit he was represented by respondent. Further, there was testimony, of which there was no contradiction by the complainant, that, in a divorce action between the complainant and his wife, she being represented by respondent, his wife obtained a final decree of divorce just a few months before Sorenson's suit No. 7892 was commenced.

(2) From the complainant's testimony, he had

known Frank Nixon twenty-seven or twenty-eight years, during the last few years of which time Frank Nixon was president of the First National Bank of Raymond; that he trusted all his business matters to Frank Nixon, "he was practically my advisor at all times."

(3) Respondent and his wife live at South Bend. They have six children, three of whom are married; he graduated in law at Ann Arbor, Michigan, in 1901, practiced law at Pontiac, settled in South Bend in 1911, and has actively engaged in practicing law at all times since. This is the first charge of any kind against him. The finance company is not one of his regular clients, the Sorenson case being the first suit in which he represented it. He first learned of the company's controversy with complainant in June, 1932, upon being retained by Fred Eichner of the finance company.

(4) According to the testimony of a large number of witnesses who have known the respondent as a resident of South Bend and who are acquainted with his social, religious, business and professional life, the reputation of respondent at all times for truth and honesty has been, and is, good.

Preliminarily, it may be further stated of the testimony generally, there is no dispute that the first time respondent saw any written instrument between Sorenson and the finance company was at a conference in W. H. Abel's office, the latter having been retained as attorney for John I. O'Phelan, one of the defendants in the suit brought by Sorenson. Those present at that conference were W. H. Abel, John I. O'Phelan, Fred Eichner, Frank Nixon, and the respondent. The respondent never at any time had in his possession any one of the instruments between complainant and the finance company. The quitclaim deed, after being

recorded, was lost. The other papers, whether originals or copies, were lost. There was some difference of opinion and recollection as to whether the obligation on the part of complainant to reimburse the finance company was contained in a separate instrument or in one containing the obligations of the finance company to complainant, that is, whether there were one or two written instruments in addition to the quitclaim deed.

The complainant, a business man who had accumulated a considerable quantity of bonds and real property, testified there were only two instruments, the quitclaim deed and the guaranty agreement. A careful reading of his testimony makes the situation rather clear to the effect that he learned an appeal in the Demir case would cost about five hundred dollars; and that he did not have ready money to meet it nor to pay the judgment for $1,745, including costs, already against him, hence his negotiations with the finance company for protection against execution on the Demir judgment and the expense of financing the appeal to the supreme court, the understanding being that the finance company would be reimbursed for its advances and expenses.

For that purpose, a mortgage was given. The guaranty agreement says nothing to the contrary. Its expressed purpose was to keep complainant harmless and without loss by reason of the Demir judgment, that is, the finance company was to stand between him and the enforcement of that judgment. The guaranty says nothing about the costs of an appeal, and yet, by the real agreement, the finance company was to pay the judgment, if affirmed, and the costs of the appeal, for which it should be reimbursed. Complainant testified that, in their negotiations, they discussed

his giving a mortgage to cover the amount of the Demir judgment, certain taxes and some other obligations of his, together with the costs of the appeal, with the final result of his giving the quitclaim deed spoken of and intended as a mortgage. After referring to the judgment in the sum of $1,745, including costs, the complainant, in answer to questions by a member of the trial committee, testified:

"Q. It did enter into your mind that you might have to pay up some money after that mortgage in case you lost out? A. I understood that it would cost me when I gave this mortgage and that they would take care of the whole of it. Q. And that it would be paid out of your property, in case you did not win? A. Yes, sir. Q. It would be paid out of your property because you gave a mortgage? A. Yes, sir."

As to the costs of the appeal in that case, in cross-examination by counsel for respondent, he testified:

"Q. Mr. Sorenson, the money that you were getting from these gentlemen, and that is the money they were to pay on this appeal to the supreme court you considered in the nature of a loan to you? Do you now? A. This mortgage was supposed to take care of that. Q. Well, but it was in the nature of a loan of money to you, was it not? A. Well, but I never received any of it. Q. They were advancing the money, because you did not have the cash? A. Yes, sir."

Now, upon complainant's own testimony as to the real agreement between the parties, it is just as reasonable (and it is according to the testimony of all of the other witnesses) that the finance company should take complainant's written promise of reimbursement as that he should take its written guaranty, whether in a joint or separate instruments, in addition to the deed given as a mortgage, which latter says nothing upon either of those subjects.

Upon his own testimony he was obligated to reimburse the finance company—quite an important viewpoint in weighing his testimony and in considering the matter of his good faith in bringing this unfortunate proceeding.

However, looking at the testimony from a technical standpoint, the complainant stands alone in his version of what are supposed to be most important facts in the case. Respondent's testimony in court, upon which this charge is based, shows upon its face his care and prudence to explain the limited opportunity he had to learn the facts, upon which he testified in language that would more nearly indicate a lack of good faith had he not explained the situation. This conclusion is justified if it be assumed for the moment that there was no instrument signed by complainant agreeing to reimburse the finance company—an unwarranted assumption upon a consideration of all of the record in the case. The same conclusion must be indulged in if, in addition, we fairly consider all of the contents of two letters, written by the respondent about the time or shortly after these charges were filed, that were introduced and relied on by the complainant, and which are too lengthy to be set out in full herein.

Respondent still insists upon the truth and good faith of his testimony complained of. In direct examination, he testified:

"Q. Did you believe the statements you made to be true? A. I did, and still believe them to be true. You will never convince me otherwise, that there was not such a document."

He repeated the statement, in effect, several times under cross-examination.

John I. O'Phelan, complainant's attorney in the Demir litigation, prepared all of the papers between

his client and the finance company. He testified that, after they were prepared, complainant took them out to show them to a friend and that the deed and the guaranty agreement were signed the next day, as he remembered, and that he never saw the signing of complainant's agreement to the finance company; that was the business of the finance company, not the business of the witness, to see after the execution of the agreement to reimburse the finance company. Time and again, he testified to such an agreement in substance, about as follows in answer to questions by a member of the trial committee:

"Q. I believe you testified either today, or yesterday morning that you drew a reimbursement agreement and had it prepared at the time that you drew a deed for the Friendly Finance Company? A. Maybe I used the word reimbursement, but I did not intend to. I intended to testify that I drew an agreement. Q. What kind of an agreement? A. That the Friendly Finance Company was to provide and secure a supersedeas bond in carrying this appeal on. Mr. Sorenson would protect those people and reimburse the Friendly Finance Company for its expense."

Fred Eichner, an officer of the finance company at the date of the instruments in question, was with complainant in John I. O'Phelan's office when the instruments were prepared. He testified:

"Q. How many instruments were prepared at that time? A. To the best of my judgment three instruments; the deed and this indemnity agreement and this other contract or agreement whatever you call it."

He further testified, with respect to the loss of the third instrument:

"Q. Do you recall, Mr. Eichner, whether later on you had a conversation with him [respondent]—I do not know whether it was over the telephone, or in his office, but you were unable to find the document? A.

Yes, I remember we were unable to locate the other later.''

C. L. Switzer, a banker in Raymond and secretary-treasurer of the finance company, testified that he left the matter to Fred Eichner and Frank Nixon, that the deed was given by complainant as security for all the finance company advances for complainant. Being questioned by a member of the trial committee, upon speaking of there being three instruments, the witness testified:

"Q. Just where did you get the idea? [three instruments] A. Really, I guess because there was an agreement made between Sorenson and The Friendly Finance Company to repay, and when this other agreement point came up, I had the impression at the trial these two instruments were all together in one. Q. Well, that does not explain, though, how you happened to think there was a third instrument, which Sorenson himself signed with a promise to pay? A. Well, there was an instrument Sorenson signed besides a deed, that was in Mr. O'Phelan's office that night. That is I think there was as I recollect it. Q. Was that on one sheet of paper, or two sheets of paper? A. Well, that I cannot recall. Q. And did he write only on,—and was the writing only on half of the sheet, or just what was the shape of it? A. Well, I cannot tell you. Q. Did you see it at all? A. I did. Q. How do you know that you saw it? A. Because I know that Sorenson signed another paper besides a deed on that very night. That is in my testimony.''

W. H. Abel, attorney for John I. O'Phelan in cause No. 7892, testified only before the trial committee in this proceeding concerning the written instruments in question, and after speaking of the conference in his office and enumerating from recollection the written instruments the parties had with them, said:

"Q. Your recollection is that there was a reimbursement agreement signed by Mr. Sorenson for these ad-

vances the company made for him? A. I think so, and that is my present recollection.''

and on cross-examination as follows:

''Q. Was there a signature of Fred Sorenson on it? A. I think so. Q. What other than Sorenson's? A. I cannot say . . . I do not think there were any others. Just the words remarking that he would re-imburse the Friendly Finance Company for any ad-vances made for and on account of his appeal.''

W. H. Abel left the conference hurriedly on a tele-phone call and did not know what became of the in-strument. It did not belong to his client.

Frank Nixon testified for the first and only time be-fore the six members of the board of governors con-cerning the number of instruments executed, saying that, at the date of the instruments, he was president of the First National Bank of Raymond and had been for a number of years, and was president of the finance company, and that, after the Demir judgment, com-plainant came to see him in the bank saying he thought the judgment was excessive and wanted to appeal but did not have the money to do so, and ''after talking to him several times I [the finance company] agreed to let him have the money.'' He repeatedly testified three instruments were executed, as follows:

''Q. How many papers did you say there were in connection with this transaction? A. Three. Q. What were the three? A. As I recall it a deed lay on my desk which I turned over to Eichner to file and these two memorandum agreements. Q. This was a memo-randum agreement alleging he could redeem his prop-erty? A. Yes. Q. How many did you sign? A. Only one, possibly two. One as I recall. Q. How many had Sorenson signed? A. He signed a deed and he signed this other memorandum agreement. Q. It was to give him the right to redeem? A. Yes. . . . Q. What were the terms of this agreement which gave Sorenson a right to redeem the property? A. The memoran-

dum stated the amount of what the costs and judgment would be and he was to repay us that amount and we would give him a deed and deed back the property. . . . Q. Sorenson agreed to repay the Friendly Finance? A. And we also had that reduced to a memorandum. Q. Is that the memorandum you talked about you saw signed? A. Yes.''

█ It is not practicable to set out herein all or more of the testimony. Enough has been given to determine the controversy, when the proper rule is applied. Respondent's testimony that is challenged referred to written instruments all of which at that time were lost, mislaid or destroyed. The testimony of his witnesses was given when all, or all except one, of the instruments were lost or mislaid. The testimony was given considerable time after the execution and loss of the instruments. The respondent and nearly all of the witnesses relied on by him had scant opportunity to observe the signatures and learn the contents of the several instruments. This was made clear by the testimony. They, necessarily, testified from memory. Under such circumstances, the testimony is not to be measured by the rule of certainty—good faith on the part of the witness is the test.

Again, as is the case here, the fact that there are some unimportant differences in the testimony of respondent and his several witnesses, compared the one with another, as to dates, conferences, number of instruments, and the precise contents of each, or the expressed clearness of memory or lack of it concerning any or all such things, considered in the light of the whole record, is at variance with any purpose or intention on the part of the respondent to distort or restrain the truth.

Upon carefully weighing all of the testimony, we are convinced that the charges have not been sus-

tained, and that the complaint should be dismissed. It is so ordered.

MILLARD, C. J., TOLMAN, HOLCOMB, and STEINERT, JJ., concur.

BLAKE, J. (dissenting)—What seem to me to be the controlling facts in this matter are not in dispute. Chronologically stated, they are:

(1) April 23, 1931, one Sorenson executed and delivered to Friendly Finance Company a quitclaim deed to certain property in Pacific county.

(2) June 3, 1932, Sorenson commenced an action in the superior court of Pacific county to cancel the deed.

(3) Friendly Finance Company (Fred M. Bond appearing as its attorney) answered and, by way of cross-complaint, alleged that the deed was executed and delivered to secure certain monies to be advanced by it to Sorenson; that it did in fact advance $2,350.28 to him. It prayed that the deed be declared a mortgage and that it be decreed a lien on the property in that amount.

(4) Upon the trial of the cause, the issue arose as to whether Sorenson was liable for a deficiency judgment. The deed contained no such obligation. Bond became a witness on the issue, and testified under oath that Sorenson had executed another instrument, in connection with the transaction, whereby he obligated himself to pay any deficiency in case the property failed to bring the amount advanced by the Friendly Finance Company.

(5) On October 15, 1932, the court entered a decree declaring the deed to be a mortgage, adjudging it to be a.lien on the property, and awarding foreclosure. The decree also provided:

"It is further considered, ordered and decreed that if there be any deficiency, that the same be paid by

said plaintiff, Fred M. Sorenson, to the defendant, Friendly Finance Company.''

(6) November 21, 1932, Sorenson filed a petition for modification of the decree. In this petition, he set up an instrument that was executed April 23, 1931, in connection with the transaction in which he had executed the deed. This instrument, however, was executed by Friendly Finance Company and others, and not by Sorenson. Its contents are not material here. It will suffice to say that the obligations under the instrument ran *to* Sorenson. In no aspect did it carry any obligation or condition to be performed or kept by him. The petition came on for hearing before the trial judge, the late Honorable Homer Kirby, who filed a memorandum opinion, from which the following quotation is taken:

''During the course of the trial it was admitted that this deed from Sorenson to the Finance Company was given as a mortgage . . . . After this concession was made by Sorenson there remained only the question of whether or not the court in the present case could allow a deficiency judgment. It was conceded by counsel for both parties that unless there was a written promise on the part of Sorenson to pay the finance company that no deficiency judgment could be entered in the foreclosure, and that the finance company would be confined to whatever funds it derived from the sale of the property covered by the deed from Sorenson. Some latitude was allowed in the matter of the introduction of proof upon the question of whether or not there was such a written promise on the part of Sorenson. The finance company contended there was such a written promise but that it had been lost, destroyed or misplaced, and consequently the proof of the execution of such promise was entirely by parol.

. . .

''It is contended by counsel for defendant finance company that the court has no authority to grant a modification or vacation of the judgment entered here-

in because the time for filing motion for new trial had expired before the filing of the original petition, and because the grounds set forth in the petition, to-wit, that fraud was committed by the defendant finance company at the trial of the suit is not substantiated by the proof. In support of this last contention counsel for defendant rely upon the assertion of counsel for plaintiff in the amended petition that he is relying upon section 464 of Remington's Code and particularly subdivision 4 thereof as follows: 'for fraud practiced by the successful party in obtaining a judgment.' Counsel for defendant contends that the claim by plaintiff that perjured testimony was introduced at the trial by the defendant would not authorize the court to vacate the judgment under authority of 464 Rem., because perjury is not fraud, and that it has been held by our supreme court that perjured evidence is not a proper cause for vacation of a judgment. . . .

"I am inclined to believe that if the document attached to the amended petition as Exhibit B as above quoted had been before the court at the time the court passed upon the right of the defendant finance company to a deficiency judgment, that the information therein set forth would have received considerable attention. . . .

"In view of all of the record in this case I feel that the judgment should be vacated, and a new trial granted, to the end that many of the matters now presented and which were not in evidence at the time of the trial, may be considered in determining the rights of the parties to this litigation."

(7) Accordingly, on May 6, 1933, Judge Kirby entered an order vacating the decree and granting a new trial.

(8) The cause came on again for trial before the Honorable Chester A. Batchelor. Bond did not testify at this trial. In fact, no one testified to any writing whereby Sorenson obligated himself to pay a deficiency judgment. Judge Batchelor filed a memorandum opinion, in which he said:

"I adhere to the view expressed by me at the time of trial, that the defendant and cross-complainant is not entitled to a deficiency judgment herein. This view is not only supported by the statute (Sections 1114 and 1119), the case of *Bradley Engineering etc. Co. v. Muzzy,* 54 Wash. 227, but also by the language of the instrument in question herein."

(9) Judge Batchelor accordingly entered a decree declaring the deed to be a mortgage, foreclosing it as such, and ordering the property sold to satisfy the amount advanced by the Friendly Finance Company to Sorenson. The decree did not contain any provision for a deficiency.

(10) After complaint had been made to the Washington State Bar Association of his conduct in testifying as he did in the trial before Judge Kirby, Bond wrote a letter containing the following:

"As explanatory of my testimony will say that I saw this instrument only once which was more than three months prior to the trial of said action. It developed at the trial that the instrument had been lost or misplaced. I gave my testimony in good faith and the facts as I honestly believed they were. I may have been mistaken as to Mr. Sorenson's signature. Yet I feel quite confident that if the lost instrument were produced, that it would have his signature thereon."

(11) Yet his testimony before Judge Kirby was positive and unequivocal on the issue. He testified:

"I saw a copy of this agreement at Mr. Abel's office one forenoon when we had our first conference. It was before the answers were prepared or any of the pleadings, and when the conference closed a short time before noon Mr. Abel was anxious to go to Aberdeen and we went over the several items pro and con and when we got down to this agreement I noticed the agreement was there and signed by the parties. . . . I know Mr. Sorenson's signature; it was there. I did not stop to read the agreement because we were in a hurry. . . . I know the contract was dated in April, 1931,

and I know it had certain propositions in it as a guaranty but I did not read it through carefully; I glanced at it, but I know it had obligations on both sides, what Sorenson was to do and what the company was to do."

And again we find the following questions and answers:

"Mr. Atwell: Now you say you did see that and know it existed? Mr. Bond: Absolutely and there is no question about it. Q. And you are sure it contained a promise to pay? A. Yes. Q. And you know Mr. Sorenson signed it? A. Absolutely I know his signature as well as any business man."

Now, in the light of these undisputed facts, it seems to me to require no argument to sustain the recommendation of the board of governors—suspension for one year. To exonerate Mr. Bond on the theory that there "must have been" or "might have been" still a *third* instrument by which Sorenson personally obligated himself to pay a deficiency judgment, is to invite reckless, if not false, testimony from attorneys who take the witness stand in behalf of their clients. The best proof that no such *third* instrument ever existed is the fact that neither Bond nor the officers of his client had the temerity to take the witness stand and swear to its existence in the trial before Judge Batchelor.

If the testimony given by Bond in the trial before Judge Kirby did not amount to perjury under Rem. Rev. Stat., § 2351 [P. C. § 9032], it was at least a flagrant violation of the canons of ethics. Archer, Ethical Obligations of the Lawyer, § 123; Code of Ethics, American Bar Association and Washington Bar Association, canons 19, 22.

At best, it is questionable practice for an attorney to testify on behalf of his client on any material issue in controversy. When he does so, it is his duty to the court, to his profession and to himself, to scrupulously

keep his testimony within the bounds of truth. In his essay on Legal Ethics, p. 72, Judge Sharswood says:

"It need hardly be added that a practitioner ought to be particularly cautious, in all his dealings with the court, to use no deceit, imposition, or evasion—to make no statements of facts which he does not know or believe to be true—to distinguish carefully what lies in his own knowledge from what he has merely derived from his instructions—to present no paper-books intentionally garbled. 'Sir Mathew Hale abhorred,' says his biographer, 'those too common faults of misreciting witnesses, quoting precedents or books falsely, or asserting anything confidently; by which ignorant juries, and weak judges are too often wrought upon.'"

Considered in the most favorable light (under his own admission), Mr. Bond's testimony was given without knowledge of the facts to which he testified and in reckless disregard of the truth.

I think the recommendation of the board of governors should be sustained.

Main, J., concurs with Blake, J.

Geraghty, J. (dissenting)—While in the main I am disposed to accept Judge Blake's interpretation of the record, I feel the purposes of discipline will be as well served by a reprimand from the court as by the suspension from practice for a year as recommended by the board of governors.

Beals, J. (dissenting)—In my opinion, Mr. Bond should be reprimanded.